**Louis DANAS and Linda Danas, Plaintiffs,**

v.

**CHAPMAN FORD SALES, INC., Defendants.**

**No. CIV. A. 99–3332.**

United States District Court, E.D. Pennsylvania.

Oct. 27, 2000.

Brett G. Mandes, Bauer & Solar, Holland, PA, for plaintiffs.

Louis Rosner, Philadelphia, PA, for defendants.

*MEMORANDUM & ORDER*

ANITA B. BRODY, District Judge.

Plaintiff Louis Danas ("Danas") filed this action against his employer, Chapman Ford Sales, Inc. ("Chapman"), alleging that Chapman unlawfully discriminated against him based upon age.[1] Danas claims that Chapman's refusal to transfer him to a more profitable team of automobile service technicians and a number of other incidents constitute discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons.Stat. § 951 *et seq.* The complaint also seeks damages for Danas and his wife, Linda Danas, for negligent infliction of emotional distress and loss of consortium.

Before me is Chapman's motion for summary judgment. The motion will be granted in part and denied in part.

---

1. In their response to defendant's motion for summary judgment, plaintiffs withdrew Counts II and IV of their complaint, which alleged discrimination on the basis of perceived disability. Accordingly, summary judgment on those counts will be denied as moot.

## FACTUAL BACKGROUND [2]

Danas was born on November 4, 1943. He is employed as a master service technician in Chapman's Northeast Philadelphia automotive service department. Danas began working as a master technician for Chapman in 1989. Chapman classifies its auto technicians by level of expertise—C, B, A, and master—with master technicians being the most experienced employees, presumed capable of handling any job that comes into the service department. At the time of the alleged events, Chapman further divided the technicians into teams identified by color. Each team had a service writer to receive work and distribute assignments to members of his team.[3]

When Chapman sold a car or when a car first came in to be serviced, that car was assigned to one of the service writers by serial number. Once assigned to a team, any future work on that car would be automatically reassigned to that same team. The longer a service writer had been with Chapman, the more cars he had in circulation as potential service jobs for his team.

Mechanics at Chapman are not paid by the actual number of hours they work, but rather by the value of the jobs they complete. Chapman pays its technicians an hourly rate based on the hours they "turn" by "clock rate." The clock rate for a given job is the number of hours allowed by the industry standard guide. Regardless of how many hours the technician actually spends on a job, he is paid for the hours he turns by the clock rate system.[4] An experienced master technician like Danas can often turn a big job in half the number of hours allowed by the clock rate. Therefore, a technician's income depends on the number of lucrative jobs assigned to his team.

Danas has worked on several teams since joining Chapman in 1989. He was initially assigned to the Silver team, where he remained for approximately a year and a half. When the Silver team was disbanded, he was placed on the Red team, where he worked for approximately six weeks. Danas was then assigned to the Green team, where he remained for at least four years, until it was disbanded in April of 1996.

When Chapman disbanded the Green team in 1996, the three remaining Green team members were assigned to other service teams. Danas was assigned to the Red team, becoming one of two master technicians on that team. Danas understood that he would be reassigned to the Green team should it be reconstituted. Should that occur, Danas was told, the three former members would be reassigned to the Green team and Chapman would make every effort to recover the Green team's former customer base from the other teams.

Danas worked on the Red team for six months, until November 1996, when he took medical leave. When Danas returned from medical leave six months later, in April 1997, he was reassigned to the Green team, which had been reestablished during his absence. By this time Danas was 54 years old. Danas was the only master technician on this new Green team, and he was the only former Green team member

2. As appropriate on a motion for summary judgment, the facts are stated in the light most favorable to the plaintiffs.

3. Chapman has made changes to its assignment system since Danas filed this claim. In April of 1999, Chapman instituted a central dispatch system. Jobs are now distributed through one dispatcher rather than through individual teams. Throughout the time of the alleged discrimination, however, the team-based assignment system was in place.

4. Chapman general manager Cecil Lam explained the system in his deposition: "Clock rate, an example would be you look in the guide and Ford may say that a transmission is 10 hours. If it takes [the technician] 5 hours, he gets paid for 10 hours. If it takes him 20 hours, he gets paid for 10 hours. It's whatever the book says." Plaintiffs' response to Defendant's Motion for Summary Judgment, Exhibit 5, at 12.

reassigned to the new Green team. At the time of Danas' reassignment, the new Green team had three members: Danas, a second technician who left Chapman within a few weeks, and a C—level technician capable of handling only the simplest jobs.

Immediately upon reassignment to the Green team, Danas requested a transfer back to the Red team.[5] The Red team consistently offered the highest earning opportunity for a master technician at Chapman. Given his seniority, Danas believed he was entitled to that job.[6] Chapman's service director at the time, Richard Gambone, denied Danas' request to rejoin the Red team. Gambone reasoned that moving Danas would deprive the Green team of a master technician, and the Red team already had a master technician who had been part of its team for many years. The Red team's master technician, Jim Eyer, was 36 years old when Danas' transfer request was refused.

When Danas was reassigned to the Green team, his earnings dropped significantly. During his stint on the Red team in 1996, and for many years before that, Danas consistently earned a weekly performance bonus. As his hours dropped, Danas lost not only compensation for those hours but also the substantial weekly bonus.[7]

Three main factors account for Danas' inability to maintain his income after the

reassignment. First, Chapman did not restore the Green team's customer base. The Green team handled a disproportionate amount of service work covered by warranty. As the hourly allowance on the clock rate system is generally lower for warranty jobs than for customer-paid jobs, Danas had poorer earning opportunities. Second, the Green team's service writer, Anthony Dodson, denied Danas access to available customer-paid service jobs even though Danas, as master technician, should have had first priority on all jobs. Third, Danas had problems with the other teams' service writers, who ignored the priority order system to keep lucrative jobs for their own team members.[8] In December 1997 and February 1998, Danas was passed over for high-paying repair jobs in favor of younger, less experienced employees. Danas repeatedly complained to Chapman management about his problems with Dodson and the other service writers, but nothing was done to resolve the problem.

In addition to describing the effects of Chapman's failure to restore him to the Red team and insure that work in the shop was properly assigned, Danas also alleges the following two incidents. In February 1998, Chapman gave Danas a disciplinary report for causing damage to a diagnostic computer. According to Danas, a younger technician was not reprimanded for a simi-

5. Danas returned to work on approximately April 14, 1997, and immediately requested a transfer to the Red team, which Chapman refused. He claims that the request was ongoing and that Chapman refused transfer requests subsequent to April 1997. Danas filed his EEOC charge on April 6, 1998.

6. Danas claims that he has a right, as a senior employee, to choose the job where the earning opportunity is highest. However, any rights Danas may have to the position on the Red team by virtue of his union contract are not relevant to the age discrimination claims before me and will not be addressed here.

7. If a master technician at Chapman bills more than 60.1 hours in a week, he earns an additional $3.00 for every hour billed that

week. Danas had averaged well over 60 hours per week in his early years at Chapman. His average weekly hours in his first four years at Chapman approached 80 hours; in 1994 and 1995, he averaged 68 hours; and in 1996, 63 hours. Danas' average weekly hours in 1997 was 54 hours; in 1998, 51 hours; for the first 38 weeks of 1999, 52 hours.

8. If a team's service writer could not find a free technician on his own team to handle a job, he was supposed to release the job to the first technician on the shop-wide "out of work" list.

lar accident.[9] In December 1997, Danas fell and hit his head while on the job. Against his will, Chapman management ordered him to seek treatment at its injury center, denying his request to deal with his own doctor after work hours. Danas lost income waiting for the injury center to find him fit to work. Danas suggests that other, younger technicians would not have been ordered to the injury center under similar circumstances.

Danas also describes a personnel meeting convened in July of 1998 by Chapman's general manager, Cecil Lam. At that meeting, Lam made statements regarding the financial burden placed on the business by a certain class of employees, namely, those who had been at Chapman for a long time. Lam said that the Company was looking for ways to lower the cost of its benefit package for those employees.

Having worked at Chapman since 1989, Danas enjoys the most generous benefit package available to technicians at Chapman. Like all technicians who have worked at Chapman for over seven years, his annual compensation package includes three weeks of paid vacation, two paid personal days, paid holidays, and six sick days. As a master technician, Danas is eligible for the $3.00 per hour incentive bonus for particularly profitable work weeks. Moreover, since Danas joined Chapman before December 15, 1992, he is "grandfathered" for insurance purposes. While more recently hired technicians receive only individual health insurance coverage, grandfathered employees such as Danas also receive family coverage at Chapman's expense.

According to Chapman, nine of its eleven master and A—level technicians were hired before December of 1992, and therefore they, like Danas, are grandfathered for insurance purposes and qualify for the maximum amount of vacation. The $3.00 per hour incentive bonus for work weeks over 60.1 hours is available to all master technicians, regardless of seniority.

## LEGAL STANDARD

Summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The role of the trial court is to determine whether there are material factual issues that merit a trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In making that determination, the court must give the nonmoving party the benefit of all reasonable inferences that might be drawn from the underlying facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Sempier v. Johnson and Higgins,* 45 F.3d 724, 727 (3d Cir.1995) (en banc). Summary judgment is appropriate if the court finds that the record "could not lead a rational trier of fact to find for the nonmoving party, [and] there is no 'genuine issue for trial.'" *Matsushita* 475 U.S. at 587, 106 S.Ct. 1348 (citation omitted).

## DISCUSSION

### I. Age Discrimination in Employment Claims under ADEA and PHRA

Two main issues are presented at summary judgment, both flowing from the familiar burden-shifting analysis applied to employment discrimination claims. First, do genuine issues of material fact preclude summary judgment on Danas' claim that he made out a prima facie case of discrimination by indirect evidence? Second, if Danas has made out a prima facie case and Chapman has carried its burden of producing legitimate, non-discriminatory reasons

---

**9.** The employee in question, Tony Raggio, was approximately 23 years old at the time of the incident.

for its actions against Danas, can Danas demonstrate that there are genuine issues of material fact in dispute concerning whether Chapman's proffered reasons were pretextual or whether age discrimination actually motivated those decisions? *See Torre v. Casio, Inc.,* 42 F.3d 825, 830 (3d Cir.1994).

Chapman also contends that summary judgment on Danas' age discrimination claims is appropriate because the claims are untimely. The issue is whether Chapman's refusal of Danas' April 1997 request for a transfer to Red team can form the basis for an ADEA violation. Danas did not file his complaint with the EEOC until April 8, 1998, and he is bound by the 300 day statute of limitations with respect to matters alleged in his complaint.[10] Danas asserts that his transfer request was ongoing and that he made subsequent, unavailing transfer requests that fall within the limitations period. Alternatively, he claims that the transfer refusals were part of a continuing practice of discrimination against Danas. As Danas presents disputed issues of material fact as to the eligibility of the transfer refusal, I cannot conclude at summary judgment that the transfer refusal cannot form the basis of Danas' discrimination claim.

The Age Discrimination in Employment Act provides, in relevant part:

It shall be unlawful for an employer— (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age; (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age.

29 U.S.C. § 623(a).[11]

In ADEA cases, the Third Circuit applies the *McDonnell Douglas* framework for the presentation of evidence in Title VII discriminatory treatment cases. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Keller v. Orix Credit Alliance,* 130 F.3d 1101, 1108 (3d Cir.1997) (en banc); *cf. Reeves v. Sanderson Plumbing Products,* 530 U.S. 133, 120 S.Ct. 2097, 2105, 147 L.Ed.2d 105 (2000) (assuming arguendo that *McDonnell Douglas* applies under the ADEA).[12] The three-step scheme allocates the burden of production in cases such as the one now before me, where no direct evidence of discrimination is offered.[13] At all times, however, the burden of persuasion remains with the plaintiff, who must demonstrate by a preponderance of the evidence that there is a " 'but-for' causal connection between the plaintiff's age and the employer's adverse action— i.e., that age 'actually played a role in [the employer's decisionmaking] process and had a determinative influence on the outcome' on that process." *Miller v. CIGNA Corp.,* 47 F.3d at 595–96 (3d Cir.1995) (en

---

**10.** The PHRA limitations period is 180 days.

**11.** The analogous section of PHRA provides: "It shall be an unlawful discriminatory practice ... [f]or any employer because of the ... age ... of any individual or independent contractor, to refuse to hire or employ or contract with, or to bar or to discharge from employment such individual or independent contractor, or to otherwise discriminate against such individual or independent contractor with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract, if the individual or independent contractor is the best able and

most competent to perform the services required." 43 Pa. Cons.Stat. § 955.

**12.** The McDonnell Douglas analysis applies equally to the analogous PHRA claim. (*See, e.g., Simpson v. Kay Jewelers,* 142 F.3d 639, 643 n. 5 (3d Cir.1998)).

**13.** Plaintiff asserts that evidence of wage loss is sufficient direct evidence of age discrimination. It is not. One cannot draw direct inferences to conclude that Danas lost wages because of his age. The three-step analysis developed for discrimination claims supported by indirect evidence controls.

banc) (quoting *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 610, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993)).

To carry his initial burden of production, plaintiff must establish a prima facie case of discrimination. *See St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If the plaintiff offers sufficient proof of the prima facie elements, the burden of production shifts to the defendant, who must offer evidence that would be sufficient, if believed, to support a finding that it had legitimate, nondiscriminatory reasons for taking the challenged employment action. *See Burdine,* 450 U.S. at 254, 101 S.Ct. 1089; *Hicks,* 509 U.S. at 506–07, 113 S.Ct. 2742; *Keller,* 130 F.3d at 1108. If such reasons are produced, the burden of production shifts back to the plaintiff, who can survive summary judgment by submitting evidence "from which the factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir.1994); *accord Sheridan v. E.I. DuPont de Nemours and Co.,* 100 F.3d 1061, 1067 (3d Cir.1996) (en banc).

## A) Step One: The Prima Facie Case

Chapman argues that summary judgment on the age discrimination claims is proper because Danas has failed to offer sufficient proof of the required prima facie elements. To establish his prima facie case, Danas must show the following four elements: (1) that he is a member of a protected class,[14] (2) that he was qualified for his position, and (3) that he suffered an adverse employment action (4) under circumstances giving rise to an inference of discrimination. *See Waldron v. SL Industries, Inc.,* 56 F.3d 491, 494 (3d Cir.1995);

*Pivirotto v. Innovative Systems, Inc.,* 191 F.3d 344, 357 (3d Cir.1999). *See also McDonnell Douglas,* 411 U.S. at 802 n. 15, 93 S.Ct. 1817 (the specification of the prima facie proof required will necessarily vary according to the facts of each case); *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089 (plaintiff must demonstrate circumstances that give rise to an inference of discrimination).

Chapman concedes that Danas meets the first two prongs, as he is (1) over 40 years of age and (2) qualified for his position. However, Chapman states that Danas cannot show that (3) he suffered an adverse employment action, nor (4) circumstances giving rise to the inference of age discrimination.

## 1) Adverse Employment Action

To meet prong three of his prima facie case, Danas must prove that the adverse employment actions he alleges are serious and tangible enough to alter the compensation, terms, conditions, or privileges of his employment; in short, he must prove that the alleged adverse actions are material to a claim of age discrimination. *See Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1300 (3d Cir.1997) (citing *Williams v. Bristol–Myers Squibb Co.,* 85 F.3d 270, 274 (7th Cir.1996) (interpreting "materially adverse action" in context of an ADEA case)). Without a materiality requirement, the Third Circuit explained in *Robinson,* which concerned a Title VII retaliation claim, "[m]inor and even trivial employment actions that 'an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit.' " *Robinson,* 120 F.3d at 1300, (citing *Smart v. Ball State University,* 89 F.3d 437, 441 (7th Cir.1996) (quoting *Williams,* 85 F.3d at 274)).

Chapman claims that Danas cannot satisfy prong three of his prima facie case because Danas fails to allege a materially adverse employment action. According to

**14.** The ADEA protects individuals who are at least 40 years of age. *See* 29 U.S.C. § 631(a).

Chapman, the reassignment of Danas to the Green team was a purely lateral transfer that did not affect any of the terms and conditions of Danas' employment; therefore, Chapman's refusal to transfer Danas from the Green team to the Red team cannot constitute an adverse employment action. Chapman largely bases its argument on the Seventh Circuit's holding in *Williams*. In *Williams*, the Seventh Circuit held that a lateral transfer involving a small, indirect effect on an employee's earnings from commissions did not rise to the level of a materially adverse employment action under the ADEA. *See Robinson*, 120 F.3d at 1301, (citing *Williams*, 85 F.3d at 274). The plaintiff in that case, Williams, had worked for many years as a salesman for E.R. Squibb. Williams brought an age discrimination claim when his job responsibilities changed following Squibb's merger with Bristol–Myers. In a reorganization of its sales force, employer Bristol–Myers Squibb reassigned Williams' sales territory and charged him with selling a new group of drugs. Although Williams continued calling on many of the same doctors he had worked with before the reorganization, he claimed that he would lose commission income while learning to market the new drugs. His commissions, which had made up 10.7% of his income at Squibb, did drop precipitously in the year of the reorganization. *See Williams*, 85 F.3d at 272.

The Seventh Circuit ruled that "[t]he question whether a change in an employee's job or working conditions is materially adverse, rather than essentially neutral, is one of fact ... and so can be resolved on summary judgment only if the question is not fairly contestable." *Williams*, 85 F.3d at 273–74. While admitting that the question was close, the Court held that the sharp drop in pay Williams suffered after the transfer did not transform the transfer into a materially adverse action. *See id.* at 274. Commissions were only a small part of Williams' compensation, the Court reasoned, and they were likely to rebound once Williams gained experience selling the new product line. *See id.*

■ *Williams* does not compel a finding that Danas' transfer from the Red to the Green team was purely lateral and that Chapman's refusal to restore Danas to the Green team did not amount to a material adverse employment action. Danas' compensation depends entirely on the number of clock rate hours he turns; he does not earn a base salary to cushion fluctuations as Williams did. A jury could reasonably find, particularly given evidence of the decrease in Danas' earnings following his reassignment to the Green team, that a transfer to a newly formed team with a poor customer base and an inexperienced service writer constitutes a materially adverse change in working conditions. Drawing all inferences from the underlying facts in favor of Danas, I find that the question of whether his transfer was an adverse employment action is too close for resolution at summary judgment.

The Third Circuit's decision in *Torre* further strengthens that conclusion. In *Torre*, the Court held that a transfer, even without loss of pay or benefits, can constitute an adverse employment action. *Torre*, 42 F.3d at 831 n. 7. The plaintiff in *Torre* survived summary judgment by demonstrating a material fact issue as to whether he had been transferred to a dead-end job that had effectively been eliminated before he assumed it. *See id.* Similarly, a reasonable jury could find that Danas' assignment to the Green team was not merely a change of color. Rather than restore the Green team's members and customer base as promised, Chapman outfitted the Green team with just three technicians—in addition to Danas, one who left within weeks of Danas' assignment and the other a C—level—a new service writer, and a weak customer base. The jury could decide that this transfer adversely affected not only Danas' compensation, but also his long-term prospects at Chapman.

### 2) Circumstances Giving Rise to an Inference of Age Discrimination

Chapman also contends that Danas cannot satisfy the fourth prong of the prima facie case, which requires plaintiff to show that the adverse employment action was taken under circumstances giving rise to an inference of discrimination. Even assuming that the assignment to the Green team was an adverse employment action, Chapman argues, Danas still fails to produce sufficient evidence that the decision to transfer Danas was made because of his age. I disagree and hold that there are contestable issues of fact as to the whether the circumstances surrounding the employment actions taken against Danas give rise to an inference of discrimination.

■ To complete his prima facie case, Danas must present "evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion." *O'Connor v. Consolidated Caterers Corp.*, 517 U.S. 308, 312, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996) (quoting *Teamsters v. United States*, 431 U.S. 324, 358, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)). In the age discrimination context, that inference can be drawn from the fact that the adverse employment action was taken to the detriment of a member of the protected class and to the benefit of another, significantly younger worker. *See O'Connor*, 517 U.S. at 313, 116 S.Ct. 1307; *see also Torre*, 42 F.3d at 831 (the fact that younger people were not transferred when Torre was transferred, and that younger employees subsumed his duties, sufficed to complete Torre's prima facie case).

Chapman has not proved an absence of evidence to support Danas' age discrimination claim. Inferences in Danas's favor can be drawn from the circumstances surrounding Danas' assignment to the Green team in April 1997. Danas was 54 when he was moved from the Red team to the new Green team. The master technician who remained on the Red team, Jim Eyer, was 36 years old at the time. Of the three former Green team members, only Danas was reassigned to the new team as originally promised. The others, Scott Schwengler and Paul Seladones, remained members of more established, "desirable" teams.[15]

In addition, factual issues remain as to why Danas was treated differently on the job. First, Danas was passed over for lucrative service jobs in favor of other, perhaps younger employees. Danas told management that the priority order was being violated, but nothing was done to improve the situation. Second, the record reveals disputes as to why Danas was given a disciplinary report for damaging a piece of equipment while a younger employee was not disciplined for a similar mistake. While the disciplinary warning alone might not rise to the level of a materially adverse employment action, the fact that Danas received such warnings while younger employees did not could constitute evidence giving rise to an inference of discrimination. Finally, the parties dispute why Danas was forced to visit the company injury center rather than his own doctor—missing work time as a result—while other, younger mechanics might have been treated differently. A reasonable jury could conclude that Chapman's tendency to single out Danas for discipline and special medical attention suggests differential treatment on account of age. "It is the very essence of age discrimination for an older employee to be fired because the employer believes that productivity and competence decline with old age." *Hazen Paper Co.*, 507 U.S. at 610, 113 S.Ct. 1701.

The comments made by Chapman General Manager Cecil Lam at the July 1998 staff meeting, however, do not constitute

---

15. Seladones was approximately 25 at the time of Danas'1998 EEOC complaint. Schwengler's age is not mentioned in the record. Neither Seladones nor Schwengler were master technicials at the time of the disputed transfer.

evidence supporting an inference of age discrimination. The parties agree that Lam said something about a specific class of employees—namely, those with seniority—placing a financial burden on Chapman. Lam explained the comments in his deposition: "There's a difference in older and longevity. You can say that you have more longevity, obviously, being older may go with it, but it doesn't have anything to do with your age." [16]

The Supreme Court in *Hazen Paper Co.* held that an employer did not violate the ADEA by acting on the basis of a factor, such as seniority, that is empirically correlated with age. *See Hazen Paper Co.*, 507 U.S. at 612, 113 S.Ct. 1701; *see also DiBiase v. SmithKline Beecham Corp.*, 48 F.3d 719, 728 (3d Cir.1995). In *Hazen*, the Court was careful not to foreclose the possibility that an employer might use a factor correlated with age—such as seniority—as a proxy for age, and take unlawful actions accordingly. *Hazen Paper Co.*, 507 U.S. at 613, 113 S.Ct. 1701. In this case, the evidence that nine of the eleven master and A—level technicians at Chapman enjoy the same seniority benefits as Danas dissolves any proxy theory that Danas might advance. A jury could not reasonably conclude that Lam's comments, aimed at those employees that place a financial burden on Chapman, were aimed at older employees such as Danas.

Even if the inference of age discrimination is not overpowering, I cannot say at this stage that it is insignificant as a matter of law. *See Torre*, 42 F.3d at 831–32. Danas has produced sufficient evidence to make his prima facie case under step one of the *McDonnell Douglas* scheme.

**B) Step Two: Legitimate, Nondiscriminatory Reasons**

As Danas concedes, Chapman has met its burden of production under the *McDonnell Douglas* scheme by offering evidence that would be sufficient, if believed, to support a finding that it had legitimate, non-discriminatory reasons for refusing Danas' request for a transfer from the Green team to the Red team.

Chapman claims that when Danas was put on the Red team following the dissolution of the Green team, he joined another master technician, Jim Eyer, who had worked on the Red team for several years. By contrast, Danas had spent only six months with the Red team. The reconstituted Green team needed a master technician. Danas had been told that he might be put back on the Green team if it was reestablished. Rather than move a master technician who had served well with the Red team for years, Chapman service manager Gambone chose to put Danas back in his former position. Those reasons allow Chapman to meet its burden of production, shifting the burden back to Danas under the third prong of the framework.

**C) Step Three: Undermining Defendant's Legitimate Reasons**

To defeat summary judgment when the defendant has answered plaintiff's prima facie case with legitimate, non-discriminatory reasons for its employment action, plaintiff must submit evidence:

From which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.

*Fuentes*, 32 F.3d at 763; *accord Sheridan* 100 F.3d at 1067. The *Fuentes* test governs the Third Circuit's approach to determining when a district court can grant summary judgment; it articulates the quantum of evidence required to allow a factfinder to conclude that defendant's proffered reasons for its action were pretextual. The plaintiff meets the test if his rebuttal evidence allows the factfinder to

**16.** Plaintiff's response to Defendant's Motion for Summary Judgment, Exhibit 5, at 65–66.

reasonably infer that each of the proffered non-discriminatory reasons is either (1) a *post hoc* fabrication, or (2) not the actual motivation for the employment action. *Fuentes*, 32 F.3d at 764.

To prevail under prong one, Danas must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons ... that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." *Fuentes*, 32 F.3d at 765 (quoting *Ezold v. Wolf, Block, Schorr & Solis–Cohen*, 983 F.2d 509, 531 (3d Cir.1992)). Alternatively, under prong two, Danas must identify evidence in the record that "allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Fuentes*, 32 F.3d at 762; *Keller*, 130 F.3d at 1111. Danas must point to evidence that proves age discrimination based solely on the probative force of the evidence. *See Keller*, 130 F.3d at 1111.

■ Danas has met his burden of demonstrating *post hoc* fabrication under *Fuentes*. The record, read in a light most favorable to the plaintiff, demonstrates that Danas' transfer was not inevitable. Inconsistencies and weaknesses in Chapman's arguments preclude summary judgment. If the new Green team needed a master technician, it did not necessarily have to be Danas. If the Red team had two master technicians, company policy did not necessarily require that one depart; Danas and Eyer had served simultaneously for six months in 1996. Indeed, Danas was told that he would be reassigned to a reconstituted Green team. However, he was the only one of the former members reassigned. Danas was also told that the new Green team would recover its customer base, but evidently this did not happen. Given these contested issues of material fact, I cannot conclude at summary judgment that plaintiff failed to defeat defendant's claimed legitimate, non-discriminatory reason for the transfer. Danas has met his burden to defeat summary judgment.

## II Negligent Infliction of Emotional Distress

■ Counts V and VI of plaintiffs' complaint, in which plaintiffs allege negligent infliction of emotional distress, must be dismissed. State law tort claims are barred by the exclusivity provision of the Pennsylvania Workmen's Compensation Act (WCA). The Act provides:

> The liability of an employer under this act shall be exclusive and in place of any and all other liability to such employes, his legal representative, husband or wife, ... or anyone otherwise entitled to damages in any action at law or otherwise on account of any injury or death as defined in section 301(c)(1) and (2) or occupational disease as defined in section 108."

77 Pa. Cons.Stat. § 481(a). The Supreme Court of Pennsylvania has held that even intentional torts arising from the employer-employee relationship are covered under the WCA. *See Poyser v. Newman & Company*, 514 Pa. 32, 38, 522 A.2d 548, 551 (1987). The WCA carves out an exception only for "an injury caused by an act of a third person intended to injure the employe because of reasons personal to him ..." 77 Pa. Cons.Stat. § 72. The Third Circuit has accordingly held that the WCA bars claims of negligent infliction of emotional distress against employers. *See Matczak v. Frankford Candy and Chocolate Company*, 136 F.3d 933, 940 ( 3d Cir.1997) (citing *Dugan v. Bell Telephone of Pennsylvania*, 876 F.Supp. 713, 724 (W.D.Pa.1994)); *see also Fieni v. Pocopson Home*, 1997 WL 220280 (E.D.Pa.1997); *Wilsbach v. Filene's Basement*, 1997 WL 805164 (E.D.Pa.1997); *Quitmeyer v. Southeastern Pennsylvania Transportation Authority* ("SEPTA"), 740 F.Supp. 363 (E.D.Pa.1990). Because Louis and Linda Danas seek damages for negligent

behavior, and seek those damages from an employer, their claim does not fall under the exception carved out the in the WCA.

### III Loss of Consortium

 Counts VII and VIII of the complaint, which bring claims against Chapman for loss of consortium on behalf of Louis and Linda Danas, also must be dismissed. Under Pennsylvania law, a spouse's right to recover for loss of consortium derives only from the other spouse's right to recover in tort. *See Murray v. Commercial Union Ins. Co.*, 782 F.2d 432, 438 (3d Cir.1986). No authority suggests that civil rights violations can support loss of consortium claims. *See, e.g. Quitmeyer*, 740 F.Supp. at 370; *see also Stauffer v. City of Easton*, 1999 WL 554602 *1 (E.D.Pa.1999). Because plaintiffs' tort claims do not survive summary judgment, their loss of consortium claims must be dismissed.

### CONCLUSION

Defendant's motion for summary judgment is therefore granted on Counts V, VI, VII and VIII. The motion is denied on Counts I and III and denied as moot on Counts II and IV. An appropriate order follows.

**AND NOW**, this day of October, 2000, it is **ORDERED** that:

1. Defendants' Motion for Summary Judgement (Docket Entry No. 9) is **DENIED** on Counts I and III;

2. Counts II and IV have been dismissed as withdrawn in an order entered this day; therefore, Defendants' Motion for Summary Judgement (Docket Entry No. 9) on Counts II and IV is **DENIED** as moot.

3. Defendants' Motion for Summary Judgement (Docket Entry No. 9) is **GRANTED** on Counts V and VI;

4. Defendants' Motion for Summary Judgement (Docket Entry No. 9) is **GRANTED** on Counts VII and VIII.