William J. DAVIS, Plaintiff,

v.

TAMMAC CORPORATION, Defendant.

No. 3:CV–98–1478.

United States District Court,
M.D. Pennsylvania.

Dec. 28, 2000.

Ralph J. Johnston, Johnston and Johnston, Kingston, PA, Joseph T. Wright, Wright and Associates, Scranton, PA, for plaintiff.

Alexia Kita Blake, Hourigan Kluger Spohrer and Quinn, Scranton, PA, for defendant.

## MEMORANDUM

VANASKIE, Chief Judge.

This action involves claims of age and disability discrimination in connection with plaintiff William Davis' termination from his employment at Tammac Corporation ("Tammac"). Davis alleges violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa.C.S.A. § 955, as well as a pendent state law claim for intentional in-

fliction of emotional distress. Tammac has moved for summary judgment on all claims. Because Davis has failed to present competent evidence that he suffers from a "disability" or was regarded by Tammac as having a "disability" as defined in the ADA, Tammac will be granted summary judgment on Davis' disability discrimination claims. Davis has provided sufficient evidence, however, to withstand Tammac's summary judgment motion on his claim of age discrimination. Thus, summary judgment will be denied as to those claims. As a result of the parties' concurrence, the intentional infliction of emotional distress claim and Davis' request for punitive damages under the PHRA will be dismissed.

## BACKGROUND

Tammac is a financial services company which markets automotive lease financing programs, manufactured housing industry financing, insurance services, credit reporting and resort industry financing. In 1991, Davis was hired by Tammac as Director of Tammac Career Services ("TCS"). TCS, which is part of Tammac's Automotive Leasing Division, was developed to offer sales programs to automobile dealerships, and supplemented the lease training programs which were being conducted by the lease division's marketing representatives.[1]

As Director of TCS, Davis' responsibilities included developing training curriculum; soliciting auto leasing dealers for the

---

1. The Automobile Leasing Division was started in 1981. The purpose of the division was to obtain commitments from car dealers to use lease financing packages offered by a local bank with whom Tammac had contracted. If an automobile was leased through such a bank, the bank would pay Tammac a fee, and in exchange, Tammac would provide certain services to the bank. Because sales dealers could recommend different banks for the leases, Tammac tried to establish a favorable relationship with the dealers.

Initially, Tammac solicited car dealerships in Luzerne, Lackawanna and Monroe Counties. Between 1981 and 1991, the division expanded into other areas of Pennsylvania, as

well as New England. Tammac hired marketing representatives for the various territories, whose responsibilities included soliciting dealers to offer the lease financing packages of the banks with whom Tammac had contracted. The marketing representatives were hired partially on their knowledge of leasing and familiarity with the dealer base in a given area. As of 1991, Tammac employed seven marketing representatives in the Automotive Leasing Division. In 1995, Tammac further expanded its territories into New Hampshire, Maine, West Virginia, Ohio, Mississippi, New York, Maryland and Florida. Marketing representatives were hired for each of these new territories.

sales training; and conducting the sales training programs.[2] Davis also occasionally performed market surveys for the lease division, which enabled Tammac to determine the viability of expanding its services into new geographic territories. Besides Davis, the only other employees in TCS were clerical and administrative staff. Davis reported to William Smith, who oversaw the auto lease division and the manufactured housing division.[3]

In the early 1990's, Tammac had a dealer base of approximately 1500 dealers. Davis provided training at approximately 29 dealerships, 11 to 12 of which were located in the Allentown, Pennsylvania area. Davis conducted approximately 20 training programs each year, and trained approximately 600 sales representatives. During his tenure, Davis also occasionally provided training programs for the manufactured housing division, and some "in-house" training for Tammac Credit Services.

Although revenues for the auto lease division as a whole grew from 1992–1995, TCS sustained losses of $30,251 in 1992; $48,561 in 1993; $25,957 in 1994 and $43,264 in 1995. Davis discussed the fees generated by TCS with Smith on a monthly basis. According to Davis, Smith never expressed concern to Davis about the income which the division was generating and did not provide any negative feedback to Davis.

In the fall of 1994, Davis asserts that Smith told him that one of the sales representatives, James Root, was going to be promoted, and that Davis would take over Root's territory in Allentown. In October 1994, Davis suffered a heart attack and had heart surgery. He returned to work in January 1995. Upon his return to work, Davis resumed his position as Director of TCS, and worked without restrictions. Davis contends, however, that management's attitude towards him changed after his heart attack, and that he was no longer involved in management's "inner circle." In June 1995, Smith informed Davis that Tammac was closing TCS because of its unprofitability, and that it was terminating Davis' position.[4]

Shortly after deciding to close the TCS division, Tammac was approached by National Auto Funding to establish an indirect auto substandard credit lending program at Tammac. NAF provides loans to individuals with a poor credit history. NAF agreed to loan funds if Tammac could commit marketing and operations personnel to approach auto dealers to arrange for the financing. For any loan which Tammac initiated, Tammac would receive a fee from NAF.

Smith contacted Davis and offered him the opportunity to head the sub-par financing program at a salary of $30,000 plus commissions. Davis was informed that the project was risky, but he accepted the position because he had no other employment options. A clerical employee, Kim Alexander, was transferred from the manufactured housing unit to assist Davis with the sub-par financing program.

In the fall of 1995, while Davis was working in sub-par financing, Root, the Allentown sales representative, was promoted to Vice President of Marketing. Tammac offered Root's position to John Senick in November of 1995, and Senick assumed Root's position on January 2, 1996.[5] Although Davis contends that he

---

**2.** Davis was paid a $50,000 salary with benefits and a company car, but no commission. In comparison, the marketing representatives in the auto lease division were paid $25,000 plus commissions.

**3.** Smith was senior vice president at the time plaintiff was hired, and was promoted to President of Tammac in 1995. Smith was 42 years old at the time Davis was terminated.

**4.** At the time of his termination, there were no vacant marketing representative positions in the Wilkes Barre area.

**5.** John Senick was a former employee of Tammac who left the company in 1994 to start his own business. Senick, at the time he left the company in 1994, was an auto lease marketing representative in the Reading territory.

was promised the position prior to his heart attack, Davis was not offered the position.

In December 1995, a few months after the sub-par program started, NAF withdraw its funding. Because Tammac did not have another funding source, Tammac closed the sub-par financing program in January of 1996, and terminated Davis' employment a second time. At the time of his second termination, Davis was not offered another position in the company; Kim Alexander, Davis' assistant, returned to her previous position in the manufactured housing unit. Davis was 49 years old at the time of his termination.

Davis filed a claim with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC"). The PHRC authorized commencement of a law suit on October 22, 1997. (Complaint, Dkt. 1, at ¶ 9.) Davis filed this action on September 4, 1998. In October of 1999, Tammac moved for summary judgment. The motion has been fully briefed and is ripe for disposition.

## I. DISCUSSION

### A. *Summary Judgment Standard*

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is "material" if proof of its existence or non-existence might affect the outcome of the suit under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Facts that could alter the outcome are material facts." *Charlton v. Paramus Bd. of Educ.*, 25 F.3d 194, 197 (3d Cir.), *cert. denied*, 513 U.S. 1022, 115 S.Ct. 590, 130 L.Ed.2d 503 (1994). "Summary judgment will not lie if

the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

Initially, the moving party must show the absence of a genuine issue concerning any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 329, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to the nonmoving party. *White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir.1988); *Continental Ins. Co. v. Bodie*, 682 F.2d 436, 438 (3d Cir.1982). Once the moving party has satisfied its burden, the nonmoving party "must present affirmative evidence to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 256–57, 106 S.Ct. 2505. Mere conclusory allegations or denials taken from the pleadings are insufficient to withstand a motion for summary judgment once the moving party has presented evidentiary materials. *Schoch v. First Fidelity Bancorporation*, 912 F.2d 654, 657 (3d Cir.1990). Rule 56 requires the entry of summary judgment, after adequate time for discovery, where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

### B. *Discrimination Claims*

Discrimination claims can be established in two ways: by direct evidence that the employer's decision was motivated by discrimination; or by indirect evidence which creates an inference of discrimination under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36

---

Senick was 39 years old when he returned to Tammac in January 1996.

L.Ed.2d 668 (1973).[6] Under the *McDonnell Douglas* burden shifting analysis, the plaintiff bears the initial burden of offering evidence sufficient to "create an inference that an employment decision was based on a discriminatory criterion illegal under the act." *Maxfield v. Sinclair International,* 766 F.2d 788, 791 (3d Cir.1985), *cert. denied,* 474 U.S. 1057, 106 S.Ct. 796, 88 L.Ed.2d 773 (1986). If the plaintiff establishes a prima facie case, the burden of production shifts to the defendant, who must then offer evidence that is sufficient, if believed, to support a finding that it had a legitimate, nondiscriminatory reason for the discharge. *Showalter v. University of Pittsburgh Medical Center,* 190 F.3d 231, 235 (3d Cir.1999); *Fuentes v. Perskie,* 32 F.3d 759, 765 (3d Cir.1994). If the defendant satisfies this requirement, then the burden of production shifts back to the plaintiff to point to some evidence that the reasons offered by the defendant were a pretext for discrimination. *Shaner v. Synthes,* 204 F.3d 494, 500–01 (3d Cir. 2000). To defeat summary judgment, the plaintiff must proffer evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Showalter,* 190 F.3d at 235; *Keller v. Orix Credit Alliance, Inc.,* 130 F.3d 1101, 1108 (3d Cir.1997) (*en banc*); *Torre v. Casio, Inc.,* 42 F.3d 825, 830 (3d Cir.1994). "To discredit the employer's proffered reason, [ ] the plaintiff cannot simply show that the employer's decisions were wrong or mistaken.... Rather the moving plaintiff must demonstrate such weaknesses or implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact-finder could find

them unworthy of credence." *Fuentes,* 32 F.3d at 765; *Sylvester v. Unisys Corp.,* No. Civ. A. 97–7488, 1999 WL 167725, at *4 (E.D.Pa. March 25, 1999). The trial court's function on a summary judgment motion is to determine whether plaintiff's evidence is sufficient "to permit a reasonable fact finder to conclude that the [employer's] reasons are incredible." *Sheridan v. E.I. DuPont de Nemours & Co.,* 100 F.3d 1061, 1067 (3d Cir.) (*en banc*), *cert. denied,* 521 U.S. 1129, 117 S.Ct. 2532, 138 L.Ed.2d 1031 (1997).

**1. *Disability Discrimination***

■ To establish a prima facie case of discrimination under the ADA, it is incumbent upon Davis to present evidence that: (1) he has a "disability" within the meaning of the ADA; (2) he was qualified for his position, with or without accommodation; and (3) he suffered an adverse employment decision as a result of the discrimination. *Shaner,* 204 F.3d at 500; *Deane v. Pocono Medical Center,* 142 F.3d 138, 142 (3d Cir.1998) (*en banc*).

A "disability" is defined by the ADA as:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). "Accordingly to fall within this definition, one must have an actual disability (subsection A), have a record of a disability (subsection B), or be regarded as having one (subsection C)." *Sutton v. United Air Lines Inc.,* 527 U.S. 471, 478, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999).

A "physical or mental impairment" for purposes of the ADA has been defined to

---

6. Claims brought under the PHRA are analyzed under the same standards as their federal counterparts. *See Connors v. Chrysler Financial Corp.,* 160 F.3d 971, 972 (3d Cir. 1998); *Kelly v. Drexel Univ.,* 94 F.3d 102, 105

(3d Cir.1996) (Title VII, ADA, ADEA); *Fosburg v. Lehigh University,* No. Civ. A. 98–CV–864, 1999 WL 124458, at *7 (E.D.Pa. March 4, 1999).

include a "physiological disorder or condition ... affecting one of more of the following systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), [and] cardiovascular...." 29 C.F.R. § 1630.2(h)(1). "Substantially limits" has been defined as, among other things, an inability "to perform a major life activity the average person in the general population can perform" or "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1). The EEOC has defined "major life activities" to include "walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(i).[7]

Davis does not contend that his heart condition substantially limits any of life's major activities. Nor does he assert that he has a record of such an impairment, *i.e.*, that he "has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. 1630.2(k). What he does claim is that Tammac perceived him to be disabled as a result of his heart condition.

A person is "regarded as" having a disability if that person:

(1) has a physical impairment that does not substantially limit major life activities but is treated by the defendant as substantially limiting a major life activity;

(2) has a physical impairment that substantially limits major life activities only as a result of the attitudes of others towards such impairment; or

(3) has no impairment at all but is nonetheless treated by the defendant as having

a substantially limiting impairment. *See Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180, 188 (3d Cir.1999); 29 C.F.R. § 1630.2(*l*). As Justice O'Connor explained in *Sutton*, 527 U.S. at 489, 119 S.Ct. 2139, the "regarded as disabled" component of the definition of a disability requires that a defendant "entertain misperceptions about the individual—he must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting. These misperceptions often 'resul[t] from stereotypic assumptions not truly indicative of ... individual ability.'"

In a "regarded as" case, such as this one, the analysis "focuses not on [plaintiff] and his actual abilities, but rather on the reactions and perceptions of the persons interacting or working with him." *Kelly v. Drexel University*, 94 F.3d 102, 108–09 (3d Cir.1996). The test, moreover, is not whether the employer harbored some unsubstantiated bias with respect to the employee's actual or perceived impairment; instead, the question is whether the employer "treated plaintiff adversely because it regarded him as having an impairment that substantially limits one or more major life activities." *Weber v. Strippit, Inc.*, 186 F.3d 907, 915 (8th Cir.1999), *cert. denied*, 528 U.S. 1078, 120 S.Ct. 794, 145 L.Ed.2d 670 (2000). "Accordingly, an employer is free to decide that physical characteristics or medical conditions that do not rise to the level of an impairment ... are preferable to others, just as it is free to decide that some limiting, but not substantially limiting, impairments make individuals less than ideally suited for a job." *Sutton*, 527 U.S. at 490–91, 119 S.Ct. 2139.

At this stage of this case, it is incumbent upon Davis to present some evidence sup-

---

7. In *Sutton*, the Court questioned whether "working" should be included as a "major life activity," observing that "it seems 'to argue in a circle to say that if one is excluded, for instance by reason of [an impairment, from working with others] ... then that exclusion constitutes an impairment, when the question you're asking is, whether the exclusion itself is by reason of handicap.'" 527 U.S. at 492, 119 S.Ct. 2139.

porting a rational inference that Tammac regarded his heart condition as substantially limiting a major life activity. Davis suggests that the major life activity that Tammac perceived to be limited by his heart condition was "working." "[T]o be regarded as substantially limited in the major life activity of working, one must be regarded as precluded from more than a particular job." *Murphy v. United Parcel Service, Inc.*, 527 U.S. 516, 523, 119 S.Ct. 2133, 144 L.Ed.2d 484 (1999). In other words, there must be evidence from which it may logically be inferred that Tammac perceived Davis' heart condition as significantly restricting his ability "to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i).

Without citing any evidence, Davis asserts that "[s]ociety views people with heart conditions and similar disorders as fragile and weak," and that "[t]here is generally a concern that any kind of stress or pressure can trigger a heart attack in someone with a heart condition." (Plf's Br. in Opp. to S.J.Mot. at 5.) In addition to failing to cite any evidence that substantiates the existence of this purported societal opinion, Davis does not cite any evidence that Tammac's decision-makers held such a view.

Thus, this is not a case like *Deane v. Pocono Medical Center*, 142 F.3d 138 (3d Cir.1998), on which Davis relies, where there was evidence that the employer had come to the conclusion, albeit erroneous, that a wrist injury substantially limited what the plaintiff could do and a vocational expert explained the import of the erroneous perception insofar as the employability of the employee was concerned. Nor is this the kind of case contemplated in 29 C.F.R. Pt. 1630 app. § 1630.2(*l*), indicating that a "regarded as" disabled employee may be a person with hypertension who is reassigned to less strenuous work because of the employer's unsubstantiated fear that

the person will suffer a heart attack. There is simply no evidence in this case that Tammac reduced Davis' responsibilities or limited his work because of some unsubstantiated concern for his health.

■ Davis contends that Tambur and Smith, Tammac's management, considered him to be weak and fragile after his surgery, and that his subsequent termination was a direct result of that misconception. That Tammac was aware of his heart surgery is not sufficient to establish that Tammac thereafter considered Davis to be disabled. *Kelly*, 94 F.3d at 105 ("the mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate either that the employer regarded the employee as disabled or that the perception caused the adverse employment action"); *see also Salley v. Circuit City Stores, Inc.*, 160 F.3d 977, 981 (3d Cir. 1998) (same); *Aucutt v. Six Flags Over Mid–America Inc.*, 85 F.3d 1311, 1319 (8th Cir.1996) (same); *Callan v. Amdahl Corp.*, No. C–94–0295–VRW, 1995 WL 261420, at *3 (N.D.Cal. April 24, 1995) ("evidence of an employer's awareness of an employee having had major surgery is not evidence that the employee's termination was on account of that surgery"). Rather, the undisputed facts show that upon returning to work after his heart surgery, neither Davis' physician nor Tammac placed any restrictions on his job. Davis testified that he worked the same hours and performed the same amount of training as before his heart surgery.

Davis further asserts a perception of disability may be inferred from the fact that he was no longer privy to management discussions after returning to work after his heart attack, and that Smith's attitude towards him changed. Even assuming that this is true, Davis has failed to show how this change in attitude translates into a belief that Davis was *substantially limited* in his ability to work. *See Robb v. Horizon Credit Union*, 66 F.Supp.2d 913, 919 (C.D.Ill.1999) (a perceived impairment does not rise to the

level of a protected disability under the ADA). Moreover, termination from a *particular* job is not sufficient to establish a "regarded as disabled" claim. *See Sutton,* 527 U.S. at 492, 119 S.Ct. 2139 (plaintiffs' allegations that defendant regarded their poor vision as preventing them from being global airline pilots did not support regarded as disabled claim because the position of global airline pilot was merely a single job which they could not perform); *Nielsen v. Moroni Feed Co.,* 162 F.3d 604, 611 (10th Cir.1998) (summary judgment affirmed where plaintiff merely presented evidence that the defendant did not consider him fit for a particular job, and failed to present evidence that the defendant believed his disability restricted his ability to perform a class of jobs).

Further belying Davis' contention is the fact that shortly after his termination from TCS, Tammac offered him the opportunity to head a new sub-par financing program.[8] Although Davis was later terminated from that position as well, Davis has offered no evidence as to actions taken or statements made by Tammac's management while he was working in the sub-par financing program that would support his disability discrimination claim based on his termination from that position. As the court noted in *Harrington v. Rice Lake Weighing Systems Inc.,* 122 F.3d 456, 461 (7th Cir.1997):

> absent any indication prior to [plaintiff's] discharge, the discharge alone does not evince that [defendant] regarded [the plaintiff] as disabled. The notion that [the defendant] must have fired [plaintiff] because it regarded him as disabled and that it plainly regarded him as disabled because it fired him is attractive but circular—it lacks a causal antecedent.

Davis' final argument is that two other individuals at Tammac, specifically Mr. Steinkircher and Mr. Grabosky, were also terminated after having heart attacks, thus leading to the inference that Tammac also considered him to be disabled. This evidence is not sufficient to create an issue of material fact as to whether Davis was "regarded as" disabled. Davis has provided mere generalizations rather than specific facts as to the circumstances of Mr. Steinkirchner and Grabosky's medical conditions and their termination from employment. Mr. Steinkirchner's complaint was limited to age discrimination. Recently, I granted Tammac's summary judgment motion as to Mr. Grabosky's disability discrimination claim, pointing out that there was no evidence that Tammac regarded him as disabled and that speculation as to Tammac's motives was insufficient to support an inference that Tammac regarded Grabosky as disabled. *Grabosky v. Tammac Corp.,* 127 F.Supp.2d 610, 616–18 (M.D.Pa.2000).

■ The coincidental existence of cardiac-related conditions in other workers who are terminated is, by itself, insufficient to support an inference that the employer regarded the workers as incapable of gainful employment. The ADA "is not a general protection of medically afflicted persons.... [I]f the employer discriminates against them on account of their being (or being believed by him to be) ill, even permanently ill, but not disabled, there is no violation." *Harrington,* 122 F.3d at 460. Because Davis has not presented competent evidence that Tammac perceived him to be substantially limited in any major life activity, Tammac is entitled to summary judgment on the ADA claim.[9]

8. Davis suggests that the sub-par financing position was actually a "phony" position, created solely for Tammac to protect themselves from liability concerning his termination in 1995. He bases this contention on the fact that he was paid $20,000 less in this position, that the program was terminated after only a few months and that a market survey was

never performed. Such evidence may be relevant to show pretext, but fails to create an issue of material fact as to whether Tammac regarded Davis as disabled.

9. Because the same standards apply to Davis' disability claim under the PHRA, summary

## 2. Age Discrimination[10]

■ Tammac contends that Davis has failed to present a prima facie case of age discrimination, and, in any event, cannot establish that the reasons behind his termination were pretextual. To establish a prima facie case of age discrimination, a plaintiff must show: (1) that s/he belongs to the protected class, *i.e.*, is at least 40 years old; (2) s/he was qualified for the position; (3) s/he was dismissed despite being qualified; and (4) was replaced by a person sufficiently younger to permit an inference of age discrimination. *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir.1997) (*en banc*); *Sempier v. Johnson & Higgins*, 45 F.3d 724, 728 (3d Cir.), *cert. denied*, 515 U.S. 1159, 115 S.Ct. 2611, 132 L.Ed.2d 854 (1995). There is no dispute that Davis satisfies the first three prongs of his prima facie case. He was 49 years old at the time of his termination, he was qualified for the position he held, and he suffered an adverse employment action. Tammac claims that Davis cannot establish the final prong because he was not replaced by a person outside of the protected class, and other sufficiently younger persons were not treated more favorably.

■ Although age discrimination may be inferred from a showing that the plaintiff was replaced by a sufficiently younger person, or that other younger persons were treated more favorably, the Third Circuit has held that a plaintiff does not have to prove replacement or favorable treatment of a person outside the protected class in order to establish a prima facie case of employment discrimination. *See Matczak v. Frankford Candy and Chocolate Co.*, 136 F.3d 933, 938 (3d Cir.1997). As the United States Supreme Court explained in *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312, 116 S.Ct.

1307, 134 L.Ed.2d 433 (1996), a prima facie case of age discrimination does not require that plaintiff show that he or she was replaced by someone outside of the protected class, but merely requires " 'evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion ....' " (*citing Teamsters v. United States*, 431 U.S. 324, 358, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)); *accord Pivirotto v. Innovative Systems Inc.*, 191 F.3d 344 (3d Cir.1999) (reiterating same standard for Title VII cases).

In denying Tammac's summary judgment motion in Grabosky's case, I found the applicable case law warranted the following conclusion:

It is enough that the plaintiff present evidence sufficient to establish an inference that the employment decision was based on the plaintiff's age. *Danas v. Chapman Ford Sales, Inc.*, 120 F.Supp.2d 478, 484 (E.D.Pa.2000). While a plaintiff could establish this element by showing that "adverse employment action was taken to the detriment of a member of the protected class and to the benefit of another, significantly younger worker," *id.* at 486, a plaintiff is not required to do so. After all, the concept of a prima facie case was not intended to be "rigid, mechanized, or ritualistic." *Furnco Construction Corp.*, 438 U.S. at 577, 98 S.Ct. 2943. "[A] prima facie case cannot be established on a one-size-fits-all basis." *Jones v. School District of Philadelphia*, 198 F.3d 403, 411 (3d Cir.1999). Requiring a terminated plaintiff to show replacement by a younger person is a mechanistic and ritualistic approach that may serve to defeat otherwise meritorious claims. This is so because "[t]he replacement of a terminated plaintiff with an individual who shares the plaintiff's

judgment will also be granted as to that claim.

**10.** The PHRA claim is subject to the same standards as the ADEA claim. *See Kelly*, 94

F.3d at 105; *Trimble v. Westinghouse Electric Corp.*, No. Civ. A. 97–7528, 1999 WL 768307, at * 5 (E.D.Pa. Sept.29, 1999)

protected attribute does not necessarily negate the inference that the plaintiff was unlawfully discriminated against." *Perry v. Woodward,* 199 F.3d 1126, 1138 (10th Cir.1999), *cert. denied,* 529 U.S. 1110, 120 S.Ct. 1964, 146 L.Ed.2d 796 (2000).

*Grabosky v. Tammac Corp.,* 127 F.Supp.2d at 620–21 (M.D.Pa.2000).

■ Of course, merely showing membership in a protected class along with termination from a position for which the plaintiff was qualified is not enough to raise an inference of illegal discrimination. In this case, Davis has presented evidence sufficient to support an inference that age was a motivating factor in the decision to fire him. Davis has asserted that while he was working at TCS, Smith told him that Root, the marketing representative for Allentown, was going to be promoted and that he would fill Root's position. At the time of his termination from TCS, Smith told Davis that Root's position would not be available, and that there were no other positions available within the auto lease division. Within six months of Davis' termination from TCS, marketing representatives were hired in various territories, all of whom were under the age of 40. The marketing representative position which Davis was allegedly promised was filled by John Senick while Davis was working in the sub-par financing unit. Senick was significantly younger than Davis (*i.e.,* 39) at the time he was hired. Davis has also provided facts that show that his youthful assistant in the sub-par financing was not terminated when the division was closed. Although the evidence is not extensive, there is enough to satisfy a prima facie case.[11]

Tammac has provided legitimate non-discriminatory reasons for its decisions.

According to Tammac, Davis was terminated from TCS because the unit was not profitable, and was terminated from the sub-par financing division because the business lost its funding source. With respect to the marketing representative position in Allentown, Tammac asserts that Davis was never considered for the position and John Senick was hired because of his experience and knowledge of the marketing area. Because Tammac has asserted legitimate non-discriminatory reasons for Davis' termination, Davis must provide evidence that would raise an inference of pretext in order to survive summary judgment.

Although it is undisputed that TCS was unprofitable, Davis contends that Tammac never intended TCS to be profitable, but instead designed the division as a loss leader. Davis asserts that neither Smith nor Tambur was concerned about the profitability of the division until after Davis suffered a heart attack. Moreover, the extent of the losses suffered by the division was small in comparison to the profits which the entire auto lease division, of which TCS was a part, earned during the same four year time period.

With respect to the sub-par financing, Davis argues that the company had lost funding sources on prior occasions, but in those instances the particular division did not go out of business. Instead, Tammac sought new financing. The facts pertaining to the sub-par financing division show that Tammac did not attempt to get new financing before closing the division.

Although it is undisputed that no positions were open at the time Davis was terminated, marketing representative positions did become available within a few months after Davis was terminated. Furthermore, with respect to the Allentown

---

**11.** In his brief, Davis refers to an alleged comment made by Tambur, Smith and Mattas that certain individuals did not "look like us." Comments by a decision maker will not constitute direct evidence of discrimination unless they relate to the decisional process itself.

*See Bullock v. Children's Hospital of Philadelphia,* 71 F.Supp.2d 482, 486 (E.D.Pa.1999) (*citing Ezold v. Wolf, Block, Schorr and Solis–Cohen,* 983 F.2d 509, 545 (3d Cir.1992)). On its face, this statement does not appear to relate to any decisional process.

marketing representative position, despite Smith's contention, Davis asserts that he had been promised the position. Had Tammac promised Davis the position, as he contends, the fact that the position was later given to a younger individual is sufficient to create an inference of age discrimination.

Finally, Davis has presented sufficient evidence from which a rational inference could be drawn that decision-makers at Tammac were aware of his heart condition. Davis has also presented evidence that under the presidency of William J. Smith, which commenced in August of 1995, two other employees in the protected class with heart conditions or similar problems were terminated. As Judge McClure observed in denying summary judgment in Steinkirchner's case, the targeting for employment termination of employees over the age of 40 who have a heart condition or similar problem "could be viewed as a form of age discrimination". *Steinkirchner v. Tammac Corp.*, No. 4:CV–98–0468 (M.D.Pa. Nov. 19, 1999).

Because Davis has offered facts, albeit not abundant, to refute Tammac's alleged non-discriminatory reasons for termination, Tammac's motion for summary judgment will be denied.[12]

*CONCLUSION*

Because Davis has failed to provide sufficient evidence to show Tammac regarded him as disabled after his heart attack, Tammac's motion for summary judgment will be granted as to Davis' disability discrimination claims. There is evidence in the record, however, which supports Davis' age discrimination claim, and accordingly, summary judgment will be denied as to that claim. An appropriate Order is attached.

*ORDER*

NOW, this 28th day of December, 2000, for the reasons set forth in the foregoing

memorandum, **IT IS HEREBY OR-DERED THAT:**

1. Defendant's Motion for Summary Judgment (Dkt. Entry 20) is **GRANTED IN PART and DENIED IN PART.**

a. As to Plaintiff's Age Discrimination Claims under the ADEA and PHRA, (Counts 1 and 3) Defendant's Motion is **DENIED.**

b. As to the remainder of Plaintiff's claims, Defendant's Motion is **GRANTED.**

2. A telephonic scheduling conference will be conducted on January 19, 2001, at 9:00 a.m. Counsel for plaintiff shall be responsible for making the arrangements for the conference call.

---

12. The parties have agreed to dismissal of the intentional infliction of emotional distress claim and Davis' claim for punitive damages under the PHRA. Accordingly, these claims will be dismissed.