Madhav S. THAKUR, Plaintiff,

v.

The R.W. JOHNSON PHARMACEU-
TICAL RESEARCH INSTI-
TUTE, Defendant.

Civil Action No. 01–1242.

United States District Court,
E.D. Pennsylvania.

June 25, 2003.

Stanley B. Cheiken, Craig B. Sobel, Law Office of Craig B. Sobel, Philadelphia, PA, for Plaintiff.

Jennifer M. Nix, Larry L. Turner, Morgan, Lewis & Bockius, LLP, Philadelphia, PA, for Defendant.

## MEMORANDUM OPINION

RUFE, District Judge.

This employment discrimination case comes before the Court on Defendant's Motion for Summary Judgment. For the reasons set forth below, Defendant's Motion is granted and the Complaint is dismissed with prejudice.

## I. FACTUAL BACKGROUND

The following is taken from the memoranda and documentary evidence submitted to the Court, and taken in the light most favorable to Plaintiff, the non-moving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Plaintiff Madhav S. Thakur alleges that his former employer, Defendant The R.W. Johnson Pharmaceutical Research Institute ("PRI"), discriminated against him on the basis of age, and then retaliated against him when he questioned the legality of PRI's conduct.

Plaintiff began working for the entity now known as PRI in 1976.[1] He was first

---

1. For purposes of clarity, the Court will refer collectively to PRI and its corporate predeces-

hired as a Scientist, and later promoted to Senior Scientist in 1980, a position he held until his termination. Plaintiff received a raise in each of his first twenty-one years with PRI, and received PRI's Development Award for outstanding contributions in his work on the Pancrease product.

Defendant contends that Plaintiff's performance record in the four years preceding his termination reflects growing problems. During this period Plaintiff received three performance ratings in the "Needs Improvement" range of 1.6 to 2.5 on a scale of one to five (2.5 for 1996; 2.0 for 1998; 2.0 for 1999) and one in the "Competent" range of 2.6–3.5 (2.69 for 1997). *See* Exs. T–29 & T–30 to Thakur Dep.; Menard Dep. at 43. Defendant concedes that Plaintiff was technically proficient in discharging his research duties, describing his technical expertise as his "strong point." Yet, PRI claims that Plaintiff's supervisors found his communication skills lacking, and offers the following example.

Plaintiff's 1996 written performance review, signed by his then-supervisor Mike Kopcha, notes that a report drafted by Plaintiff had to be re-drafted "in a more concise and coherent manner," and states that Plaintiff needs to "develop more fully his writing skills." It further concluded that Plaintiff's written work "needs to be better organized," and to better communicate his scientific findings. Finally, the same report reiterated that Plaintiff's "written and verbal communication skills need to be improved to more effectively conduct day-to-day business." In his written response to these criticisms, Plaintiff expressed surprise at the comments, and denied any problem with his communication skills. He closed his response, "Right from start [sic] you singled me out for not cooperating with others. Is it discrimination? I hope not." *See* Ex. T–25 to Tha-

kur Dep. However, Plaintiff did testify that one of his supervisors spoke to him about his writing and communication skills, and that he received assistance from another supervisor on drafting a report. Thakur Dep. at 200.

In June 1998, Plaintiff came under the supervision of Francois Menard, to whom he reported until his termination. Plaintiff testified in his deposition that upon arrival at PRI Menard excluded him from meaningful participation in the department. Thakur Dep. at 85–86, 93, 120–21. Menard, on the other hand, testified that Plaintiff's performance was deficient with respect to his writing skills, and in other respects. He offered three incidents as examples. First, in July 1998, Menard received a complaint from one of PRI's business partners in Puerto Rico, saying that an e-mail authored by Plaintiff contained a "disrespectful . . . tone." Menard Dep. at 21. Menard spoke to Plaintiff about this incident, and Plaintiff apologized to the business partners. Thakur Dep. at 217.

Second, in August 1998, the team leader for a project requested that Menard remove Plaintiff from the team. The team leader complained to Menard about Plaintiff's performance relating to communication within the team, teamwork, and Plaintiff's inability to identify and implement solutions for the project. Menard removed Plaintiff from the team, and reassigned Plaintiff's team duties to himself. Menard Dep. at 18–19.

Third, in the fall of 1998, Plaintiff was asked to go to a manufacturing site to provide technical assistance on behalf of PRI. He was late for the appointment, arriving after the manufacturing process for which he was to provide technical sup-

sors as PRI.

port had already begun. After his departure from the site, several "critical issues" arose that became "major problems" for PRI. Menard Dep. at 20.[2] Plaintiff testified that Menard never spoke to him about this incident. Thakur Dep. at 218:18–21.

PRI contends that throughout 1999 Menard learned of other problems involving Thakur, including communicating with and getting along with co-workers, cleaning and using equipment, and preparing written reports in good form. Menard claims that he communicated these problems to Plaintiff. Menard Dep. at 39–40.

As he did for all employees under his supervision, Menard met with Plaintiff in December of 1998 and 1999 to discuss Plaintiff's performance for the previous year. During the December 1998 performance review, Menard began the meeting by simply handing to Plaintiff his written performance rating of 2.0, and never said anything to Plaintiff.[3] Plaintiff expressed his disappointment, saying Menard never accorded him the respect he deserved, and that the low rating reflects discrimination against him. Thakur Dep. at 209–10. Plaintiff next said, "[Y]ou are giving me zero raise. That means you—you're going to fire me. Are you going to fire me or are you—I think I said why don't you then give me a package," referring to a severance package offered to some other PRI employees. Thakur Dep. at 210:10–13; Menard Dep. at 31–32. In a follow-up meeting in January 1999, Menard and Plaintiff

discussed specific ways to improve Thakur's performance. Menard Dep. at 30–31, 33–34, & Email of 2/6/1999 from Menard to Thakur. Plaintiff never received any written evaluations of his performance from Menard, other than the numerical performance ratings, but Menard contends he gave oral feedback to Plaintiff on an ongoing basis. Menard Dep. at 27–28.

At the December 1999 performance review, Plaintiff again received a 2.0 rating, and learned he would not receive a raise. Menard Dep. at 43:22–23. After some discussion, Plaintiff again asked for a severance package, which Menard agreed to inquire into. Thakur Dep. at 212–13; Menard Dep. at 43–45. Describing his reaction to this news, Plaintiff testified, "I kept quiet, because I knew company—that two years at zero raise means you are ready to fire me. That's what he always wanted, me to be fired." Thakur Dep. at 212:10–12. Plaintiff maintains that at neither the December 1998 nor the December 1999 performance review did Menard discuss any aspect of his job performance. Thakur Dep. at 133:24–134:12; Letter of 5/3/00 from Thakur to Hochberg–Smith at 2.

Internal PRI discussions began regarding a possible termination of Plaintiff, with a severance package. Menard Dep. at 45, 53. In a March 13, 2000 human resources memorandum, it was noted that Menard "has had continuing discussions about performance with [Plaintiff] as he has encoun-

---

2. PRI contends that Plaintiff "admitted during his deposition that his involvement in the incident was viewed as a problem." However, upon review of the deposition testimony, and taking his statements in the light most favorable to him, it appears to the Court that PRI is attempting to take Plaintiff's statements out of context. At the very least, placing the statements in context, it is certainly not clear that Plaintiff is admitting fault or responsibility for any mishap, as PRI would have it.

3. Plaintiff and Menard provide slightly different accounts of this meeting, and so the Court must credit Plaintiff's version here. Menard contends that the meeting lasted approximately 30 minutes, during which he reviewed orally the basis for the 2.0 performance rating, and discussed ways for Plaintiff to improve his performance. Menard Dep. at 29–31.

tered difficulty in maintaining adequate job performance since 1997." Memorandum of 3/13/00 from Robinson to Deyo, et al. It reviewed his declining performance ratings and lack of pay increases, and continued:

> [Plaintiff] has not kept pace with developments in the field. He has difficulty with written communications, sometimes having to correct his material four or five times to make his work clear and understandable. He has difficulty finishing assignments in timely fashion, with the exception of his work with Topiramate. With regard to this product, he does provide a level of expertise not otherwise available within the work group. While that product is important to us, that expertise alone is not enough to make a total contribution to the group's objectives.... [W]e believe it would be to our advantage to offer a contract for him to work on Topiramate®, as needed.

*Id.* It further noted that Plaintiff "has stated an interest in a separation agreement," and concluded by recommending termination with a severance package. *Id.* Although this severance package was discussed internally, at no time did PRI make any efforts to determine whether Plaintiff could be reassigned to another position within PRI. Menard Dep. at 48:6–20.

On March 29, 2000, PRI offered Plaintiff a separation agreement and terminated his employment as of April 14, 2000. *See* Letter of 3/29/2000 from Vonderhorst to Thakur (the "Separation Agreement"). The Separation Agreement included an offer to work as a consultant to PRI at an hourly wage to conduct work on the Topiramate product. *Id.* ¶ 6. In discussing the Separation Agreement during a meeting with Menard and a human resources officer, Mr. James Kuhn, Plaintiff stated that if he were to work in a consulting capacity,

he did not wish to work with Menard. Plaintiff signed the Separation Agreement on April 10, 2000. Thakur Dep. at 59–63; Separation Agreement at 7. After Plaintiff left, his work load was "spread out among the other scientists" at PRI, all of whom were younger than Plaintiff, who was just shy of 64 years of age. Menard Dep. at 65:2–3; Thakur Dep. at 145:18, 215:1–3 (Plaintiff was oldest employee in his work group); Complaint ¶ 7 (Plaintiff was born on May 17, 1936).

Soon thereafter, on April 14, 2000, Plaintiff called Ms. Marion Hochberg–Smith at PRI and said that he wanted to revoke the Separation Agreement, and that he believed he had been discriminated against. However, he also told Ms. Hochberg–Smith that he wanted an extension of time to further consider the terms of the Separation Agreement. Thakur Dep. at 64 & Ex T–3; Letter of 4/16/00 from Kuhn to Thakur. Plaintiff had the same conversation with Mr. Kuhn, and explained to Mr. Kuhn that he and Ms. Hochberg–Smith were having an ongoing discussion about his charge of discrimination. Thakur Dep. at 65. In an April 16, 2000 letter from Mr. Kuhn to Plaintiff, PRI granted an extension of "two or three days," or until Ms. Hochberg–Smith completed her inquiry into Plaintiff's "statements." The letter also set forth in greater detail the terms of the consulting work offered in the Separation Agreement. Letter of 4/16/00 from Kuhn to Thakur. The next day, a faxed note from PRI to Plaintiff confirmed the extension, and stating that it "will allow Marion Hochberg–Smith to review the issues." Facsimile of 4/17/00 from Vanderhorst to Thakur.

On May 3, 2000, Plaintiff followed up with a letter to Ms. Hochberg–Smith regarding his charge of discrimination. *See* Letter of 5/3/00 from Thakur to Hochberg–Smith ("I was hoping to hear from

you by now."). Plaintiff set forth a numbered list of complaints and concerns regarding the nature of his termination, including, among other things, (1) that he was terminated with only a week's notice after 23½ years of employment with PRI, a fact he described as "disgraceful" and depriving him of an "honorable exit with dignity"; (2) that he had been called to Menard's office under the pretext of discussing a research project but instead was handed a notice of separation; (3) that Menard had engaged in a "deceitful pattern" of conduct towards him, such as by excluding Plaintiff from discussions about projects on which he was working, only to offer him in the Separation Agreement a consulting position on the same projects; (4) that he had always satisfactorily answered queries regarding PRI products; (5) that he had received "0" pay raises for 1999 and 2000, but never received a formal or informal critique of his performance from Menard; and (6) that he never approached any "higher authority" within PRI because he did not wish to make a "big fuss," because he was planning to retire within a few years, and because he always felt an obligation to PRI, who was sponsoring a scholarship for his son at Harvard University. *Id.*

PRI reissued the Separation Agreement to Plaintiff on June 28, 2000. *See* Letter of 6/28/00 from Vonderhorst to Thakur. On July 11, 2000, Plaintiff rejected the Separation Agreement in a handwritten note faxed to PRI, with a hard copy following via mail. Thakur Dep. at 140–41 & Ex. T–8 thereto. Thereafter, in accordance with PRI policy, Plaintiff received $71,476.92 in certain benefits and severance pay. *See* Separation Agreement ¶ 3 ("You are entitled to certain benefits and to severance pay ... whether or not you sign this Agreement and Release.").

On July 18, 2000, Plaintiff, through his attorney, wrote to PRI, stating in relevant part:

Please be advised and put on notice that my firm has been retained by your former employee Madhav S. Thakur concerning an age discrimination/wrongful discharge case. As you have been apprised by Mr. Thakur the [Separation Agreement] has been rejected.... However in reviewing your letter offer agreement, I note the offer of a consulting position. Kindly provide my office with the terms, hours, pay rate and conditions of said independent consulting position extended to Mr. Thakur.... Lastly, please provide to my office should my client consult for your company, assurances that he would not be further discriminated against or retaliated against by other employees and management.

Letter of 7/18/00 from Sobel to Vonderhorst. PRI's attorney responded to this letter, stating that the company was satisfied that there had been no discrimination or wrongful discharge, that the reasons for his termination had been well documented and communicated to Plaintiff, and concluding, "With respect to a consulting position, in light of your client's unwarranted reservations that is probably not an optimal solution." Letter of 8/2/00 from O'Shaughnessy to Sobel.

Plaintiff filed a charge of discrimination with United States Equal Opportunity Commission and the Pennsylvania Human Relations Commission on August 9, 2000, and initiated the instant action on March 16, 2001. Plaintiff seeks redress for alleged age discrimination and retaliation by PRI, and asserts claims under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA") and the Pennsylvania Human Relations Act, 43 P.S. § 955 *et seq.* ("PHRA"). Jurisdic-

tion is premised on a federal question and this Court's pendent jurisdiction. *See* 28 U.S.C. §§ 1331, 1367.

The case was stayed between June 2001 and June 2002 while Plaintiff pursued his claim within PRI's dispute resolution program. In August 2002 this case was reassigned to this judge's calendar,[4] and discovery proceeded thereafter. Defendant PRI now moves for summary judgment on all claims.

## II. *SUMMARY JUDGMENT STANDARD*

The underlying purpose of summary judgment is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense. *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). Under Fed.R.Civ.P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In order to avoid summary judgment, disputes must be both 1) material, meaning concerning facts that are relevant and necessary and that might affect the outcome of the action under governing law, and 2) genuine, meaning the evidence must be such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The moving party bears the initial responsibility for informing the Court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. It is not required to produce any evidentiary materials to negate the opposing party's claim. *Id.* The burden then shifts to the nonmoving party to designate, through the use of affidavits and other evidentiary materials, specific facts showing that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548; Fed.R.Civ.P. 56(e). In deciding a motion for summary judgment, all facts must be viewed and all reasonable inferences must be drawn in favor of the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## III. *DISCUSSION*

Based on the facts set forth *supra* at Part I, Plaintiff alleges that PRI fired him because of his age in violation of the ADEA and PHRA. In addition, Plaintiff contends that PRI rescinded its offer of a consulting position when it learned that Plaintiff intended to pursue a claim of discrimination, and that such conduct constitutes retaliation prohibited by the ADEA and PHRA. Each of these claims is discussed below.

### A. Intentional Age Discrimination—Counts One and Two

Under the ADEA and the PHRA, it is unlawful for an employer to discharge any individual because of that individual's age. 29 U.S.C. § 623(a)(1) (2003); 43 P.S. § 955(a) (West Supp.2003). There is no need to differentiate between Plaintiff's ADEA and PHRA claims because the

---

4. The case was reassigned pursuant to the Eastern District of Pennsylvania's procedure for random reassignment of cases.

same analysis applies for purposes of today's decision. *Jones v. Sch. Dist. of Philadelphia,* 198 F.3d 403, 410 (3d Cir.1999); *Connors v. Chrysler Fin. Corp.,* 160 F.3d 971, 972 (3d Cir.1998). Generally, a plaintiff can establish that he has been subjected to illegal employment discrimination through use of either direct evidence, *see Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), or through use of indirect or circumstantial evidence. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Because Plaintiff has not adduced any direct evidence of discrimination, the Court proceeds analytically under the rubric of *McDonnell Douglas,* and its burden-shifting framework, as clarified in *Reeves v. Sanderson Plumbing Prods.,* 530 U.S. 133, 142–43, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *see also Keller v. Orix Credit Alliance, Inc.,* 130 F.3d 1101, 1108 (3d Cir. 1997) (en banc). Although the burdens shift back and forth between a plaintiff and a defendant, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

■ First, the plaintiff bears the burden of establishing, by a preponderance of the evidence, a prima facie case of discrimination. *Reeves,* 530 U.S. at 142, 120 S.Ct. 2097. In the age discrimination context, this requires a showing that the plaintiff was (1) a member of a protected class, *i.e.,* forty years of age or older; (2) was qualified for the position at issue; (3) suffered an adverse employment action; and (4) was replaced by a sufficiently younger person, raising an inference of age discrimination. *Anderson v. Consol. Rail Corp.,* 297 F.3d 242, 249 (3d Cir.2002). In the case at bar, the parties have not adequately discussed whether Plaintiff can establish a prima facie case,[5] instead focusing almost all of their arguments on the "pretext" stage of the analysis (discussed *infra* ). In any event, because the Court's decision rests on the pretext issue, it will assume for purposes of analysis that Plaintiff can establish a prima facie case.

If the plaintiff succeeds in making this showing, there arises a presumption of

---

**5.** PRI dedicates a single sentence of its memoranda to suggesting that Plaintiff cannot establish that he was replaced by someone younger, and Plaintiff does not respond to it. Although the requirement that a plaintiff be replaced by a sufficiently younger person has often been repeated as constituting the fourth prong of the prima facie case in the age discrimination context, well reasoned opinions have questioned whether it is absolutely essential, or if such a fact merely supports the critical showing of an inference that the adverse employment action was based on an illegal discriminatory criterion. *See, e.g., Baselice v. Philadelphia Fed'n of Teachers Health & Welfare Fund,* No. Civ.A.01–477, 2002 WL 827128, at *2 n. 6 (E.D.Pa. May 1, 2002) (to meet fourth prong, "any age disparity between plaintiff and other employees which creates an inference of age discrimination will suffice"); *Davis v. Tammac Corp.,* 127

F.Supp.2d 625, 633–34 (M.D.Pa.2000); *Grabosky v. Tammac Corp.,* 127 F.Supp.2d 610, 618–20 (M.D.Pa.2000); *accord Danas v. Chapman Ford Sales, Inc.,* 120 F.Supp.2d 478, 484–86 (E.D.Pa.2000).

Here, the record reveals that Plaintiff was not replaced by anyone; rather, his duties were redistributed to other workers who were younger. Because the parties have failed to advance any substantial argument as to how these particular facts interplay with the legal requirements of the prima facie case, the Court will not address the issue. *Compare Bartholomew v. St. Luke's Hosp.,* No. Civ. A.02–2876, 2003 WL 21250561, at *3–5 (E.D.Pa. Apr.29, 2003) (noting that the Third Circuit has not specifically held whether strict adherence to the "sufficiently younger" prong is required, but declining to reach the issue because plaintiff failed to produce other evidence of age discrimination).

unlawful discrimination, and the burden then shifts to the employer to rebut the presumption by articulating a legitimate, non-discriminatory reason for the adverse employment action. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506–07, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). In the instant matter, this stage of the analysis is also not at issue, as PRI has stated that Plaintiff's termination arose from certain job performance problems.

In the final step, the presumption drops from the case, and the plaintiff "must be afforded an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089. This he can do "by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 256, 101 S.Ct. 1089. "[A]lthough the presumption of discrimination drops out of the picture once the defendant meets its burden of production, the trier of fact may still consider the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom ... on the issue of whether the defendant's explanation is pretextual." *Reeves*, 530 U.S. at 143, 120 S.Ct. 2097 (internal quotes and citations omitted); *see also Jones*, 198 F.3d at 412 (at this stage of the analysis, "the court focuses on whether there is sufficient evidence from which a jury could conclude that the purported reasons for defendant's adverse employment actions were in actuality a pretext for intentional ... discrimination").[6]

In order to defeat a defendant's summary judgment motion at the pretext stage, a plaintiff "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir.1994). With regard to discrediting an employer's proffered reason, the Third Circuit has said:

> [T]he plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the nonmoving plaintiff must demonstrate that such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence.

*Id.* at 765; *accord Carson v. Bethlehem Steel Corp.*, 82 F.3d 157, 159 (7th Cir.1996) ("[F]ederal courts are not arbitral boards ruling on the strength of 'cause' for discharge. The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is discrimination."). Discrediting the employer's proffered reason only aids the plaintiff insofar as it "permit[s] a reasonable factfinder to infer that the employer did not act for the proffered reasons." *Shaner v. Synthes*, 204 F.3d 494, 503 (3d Cir.2000). It is this issue of pretext where the parties diverge, with PRI and Plaintiff differing over whether the record contains sufficient evidence that could either give rise to an inference of discrimination, or that could cast doubt on the credibility of PRI's proffered explanation.

---

**6.** At trial, however, a plaintiff must prove "*both* that the reason was false, *and* that discrimination was the real reason." *Hicks*, 509 U.S. at 515, 113 S.Ct. 2742.

■ In advancing its Motion, PRI contends that Plaintiff cannot demonstrate that he was the victim of intentional discrimination on the basis of age. In sum, it points out that Plaintiff received low performance ratings in the years preceding his termination, that supervisors had repeatedly criticized Plaintiff's communication and writing skills during this time, that several other performance problems arose, that Plaintiff was aware that his performance was considered deficient, and that this course of events led Plaintiff to request and ultimately receive the offer of a severance package. In response, Plaintiff offers three bases upon which a jury could reject PRI's proffered reason and infer discrimination.

First, he contends that PRI has not been consistent in stating the reason for Plaintiff's termination. He places special emphasis on one of PRI's statements in Plaintiff's application for unemployment benefit payments from the Pennsylvania Unemployment Compensation Bureau. *See* Employer's Notice of Application. Plaintiff told the Bureau that he had been "fired." By contrast, PRI stated in the application that Plaintiff had "Retired w/Severance." *Id.*

Plaintiff's special emphasis on this statement is misplaced. Considering all of the circumstances surrounding Plaintiff's separation, even taken in the light most favorable to Plaintiff, it would be a stretch to say that PRI's statement that Plaintiff retired with severance was inconsistent with its prior statements. Plaintiff began requesting a severance package at the end of 1998, and reiterated his request at the end of 1999. *See, e.g.,* Thakur Dep. at 210:11–13 ("Are you going to fire me or are you—I think I said, why don't you then give me a package."). The possibility of a severance package was ultimately taken up by PRI, debated internally, and eventually of-

fered to Plaintiff. The fact that Plaintiff ultimately rejected the specific terms offered to him in the Separation Agreement does not mean that he did not retire with severance. In fact, the record reveals that Plaintiff did, in fact, retire with severance in the amount of $71,476.92. *See* Separation Agreement ¶ 3 ("You are entitled to certain benefits and to severance pay ... whether or not you sign this Agreement and Release."). This is further underscored by the fact that following his separation from PRI Plaintiff described himself as "retired." Recalling an interaction with an acquaintance, he said, "He knows I'm retired. That's what everybody knows. I retired, yes." Thakur Dep. at 193:20–21.

Moreover, whether Plaintiff technically "retired" or was "fired" from PRI is perhaps open to debate, but it adds little or nothing to the critical inquiry, *i.e.,* whether PRI's justification for Plaintiff's separation is "unworthy of credence." *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089. PRI's statement in Plaintiff's unemployment benefits application might suggest some ambiguity as to the posture, manner, or nature of Plaintiff's separation from PRI, but it does not suggest that the *reason* for Plaintiff's separation from PRI was anything other than deficient performance, as PRI has contended all along.

In addition to the PRI statements in the unemployment benefits application, Plaintiff attempts to create inconsistencies out of other PRI statements where there clearly are none. For example, he compares and contrasts an internal PRI memorandum that criticizes Plaintiff's ability to keep pace with developments in his field, with Menard's criticism of Plaintiff's ability to get along with others. He contends that these criticisms were never before cited as a basis for Plaintiff's termination prior to this lawsuit, and that they are offered now as post hoc rationalizations

advanced solely for purposes of defeating Plaintiff's claim. However, Plaintiff ignores other portions of the same memorandum on which he relies that note "continuing discussions" between Menard and Plaintiff regarding performance problems, as well as Plaintiff's "difficulty with written communications." Memorandum of 3/13/00 from Robinson to Deyo, et al.

In light of the foregoing, the Court concludes that a jury could not disbelieve PRI's stated reasons for Plaintiff's separation based on these alleged inconsistencies. In other words, Plaintiff has failed to present evidence amounting to "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered reasons for its action that a reasonable factfinder could find them unworthy of credence." *Fuentes,* 32 F.3d at 765.

Second, Plaintiff contends that there is sufficient evidence of Plaintiff's *good* performance to belie the notion that PRI fired him for bad performance. He notes that he received a raise in each of his first twenty-one years of employment. Furthermore, he calls attention to an internal PRI memorandum that highlights the value of Plaintiff's scientific expertise. Finally, he notes that PRI offered him a consulting arrangement, thereby suggesting that PRI was satisfied with his performance, but wanted to eliminate an older permanent employee. With this evidence in mind, he argues, a jury could conclude that his termination was not based on subpar performance, but rather on his age.

This evidence is also insufficient to discredit PRI's proffered explanation. It is clearly established in employment discrimination cases that "[p]retext is not established by virtue of the fact that an employee has received some favorable comments in some categories or has, in the past, received some good evaluations." *Ezold v.*

*Wolf, Block, Schorr and Solis–Cohen,* 983 F.2d 509, 528 (3d Cir.), *cert. denied,* 510 U.S. 826, 114 S.Ct. 88, 126 L.Ed.2d 56 (1993). As such, the fact that Plaintiff received raises earlier in his career is inapposite.

 Nor is it significant if PRI thought Plaintiff was a brilliant scientist, so long as its proffered reason for terminating Plaintiff is worthy of credence. In making employment decisions, an employer is entitled to utilize subjective criteria, determine which criteria are outcome determinative, and describe its reason for the adverse employment action in those terms. A court may not question an employer's basis for terminating an employee unless that basis is rooted in illegal discrimination or otherwise contravenes the law. *See, e.g., Leung v. SHK Mmgt., Inc.,* No. Civ.A.98 3337, 1999 WL 1240961, at *7 (E.D.Pa. Dec.21, 1999) ("The fact that an employer relied on a particular area where an employee is deficient in making the decision to terminate an employee, ignoring many areas where the employee excels, is not evidence of discrimination unless the plaintiff can show that other similarly situated employees were judged according to different criteria."). The fact that PRI may have considered Plaintiff's technical expertise to be an asset does not preclude it from firing him for what it viewed as some other shortcoming, so long as it did not denote his membership in a protected class as a shortcoming, and so long as it judged similarly situated employees according to the same criteria. There is no evidence in the record that PRI deemed Plaintiff's age to be a shortcoming; by contrast, the record contains substantial evidence of his performance-related shortcomings. Similarly, Plaintiff has produced no evidence regarding PRI's treatment of other similarly situated employees.

Of course, a plaintiff may discredit an employer's proffered reason if there is evidence that contradicts the proffered reason, or tends to show that the employer did not actually rely on the proffered reason. *See, e.g., Brewer v. Quaker State Oil Ref. Corp.,* 72 F.3d 326, 331 (3d Cir.1995) (plaintiff survived summary judgment where proffered reason for termination was poor performance, but employer had stressed that sales volume was primary measure of performance, employee had exceeded sales quotas and received a bonus three months before he was fired, and was the only sales representative who received such a bonus). Here, Plaintiff adduces no such evidence. To the contrary, he admits that he was counseled about problems with his writing and communication, and even testified that he was aware that he was destined for termination in light of the fact that he did not receive a raise two years in a row. Thakur Dep. at 200, 212. His good performance as a scientist notwithstanding, there is no dispute that there were issues with other aspects of his performance, and Plaintiff fails to contradict PRI's reliance thereon.

Finally, Plaintiff contends that PRI failed to adhere to its own corporate policies in dealing with him, and that this raises an inference of discrimination. First, he contends that PRI policy required Menard to provide Plaintiff with either written or informal performance evaluations, that Menard failed to do so because he did not want to give Plaintiff any opportunity to improve his performance, and that a reasonable jury could therefore conclude that Menard was discriminating against Plaintiff. Second, he contends that PRI failed to conform to its policy of attempting to reassign veteran and older employees to another position within PRI before resorting to termination.[7]

Even assuming PRI did not conform to its own policies, this is not evidence of discrimination unless Plaintiff can show that PRI administered these policies in a discriminatory manner. For example, if Plaintiff showed that Menard evaluated other Senior Scientists in oral and written form, but did not extend the same manner of critique to Plaintiff, an inference of discrimination might arise. *See, e.g., Keller,* 130 F.3d at 1111 ("Evidence that a plaintiff was not criticized may take on significance if the plaintiff can show that other comparable employees regularly received express evaluations of their work."); *Leung,* 1999 WL 1240961, at *7 ("Evidence of a lack of criticism may become important if the plaintiff can show that, in this respect, she was treated different than other similarly situated employees.").[8] Plaintiff has

**7.** The relevant policy provides:

> Where an employee's performance [is] judged inadequate following an extended period of acceptable performance in the past, and where extraordinary circumstances do not prevail, and where corrective actions do not work, and where the employee meets either the following limits:
> • 20 or more years of company service, or
> • age and company service equaling 60 or more,
> the employee may, as appropriate, be offered reassignment *one time* to another position where it is anticipated by man-

agement that there is a good chance of success, not necessarily at the same level but without loss of pay. Should the employee refuse reassignment which is viewed appropriate by management the normal termination process will apply.
PRI Policies and Procedures, § VI.A.6.

**8.** As the Third Circuit has noted, "[e]mployers who are dissatisfied with the performance of their employees sometimes voice express criticism to those employees, but employers do not always do so." *Keller,* 130 F.3d at 1111. It is not for this Court to approve or disapprove of Menard's management practices, but only to ask if his practices violate age discrim-

produce no such evidence, and in fact the only evidence in the record is to the contrary. *See* Menard Dep. at 27:4–18 ("I did performance assessments, but we did not fill out the written form."). Similarly, if Plaintiff could identify other veteran or older employees who were offered reassignment within PRI, it would be evidence of discrimination because there is no dispute that Plaintiff received no such offer. However, he has produced no such evidence, or any other evidence to suggest that age "actually played a role in [the decision making] process and had a determinative influence on the outcome." *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 610, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993).

The Court notes that Plaintiff in reciting the facts of this case repeatedly states that Menard excluded him from any meaningful role in the department. Yet, nowhere in discussing his legal claim does Plaintiff attempt to explain to the Court exactly how this allegation gives rise to an inference of age discrimination, which if it does not makes it immaterial to the issues at hand. *See* Fed.R.Civ.P. 56(e) (when responding to a motion for summary judgment, opposing party "must set forth specific facts *showing* that there is a *genuine* issue for trial") (emphasis added). Nor has he cited any case law addressing whether exclusion, on its own, would somehow suggest discrimination.[9] Given the absence of any other factual circumstances supporting Plaintiff's claim that he was the subject of intentional discrimination, and in the absence of any articulated connection between Menard's alleged conduct and age discrimination, this "mere scintilla of evidence" in Plaintiff's favor is not enough to

withstand summary judgment. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505.

Upon review of the parties' submissions, the Court holds that Plaintiff has failed to offer any evidence "from which a factfinder could reasonably ... disbelieve the employer's articulated legitimate reasons" for his separation from PRI, or "believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of" his separation. *Fuentes,* 32 F.3d at 764. Accordingly, summary judgment in favor of PRI on Plaintiff's intentional discrimination claims is appropriate.

**B. Retaliation—Counts Three and Four**

■ Plaintiff claims that after PRI learned that he planned to assert an age discrimination claim against PRI, it decided to revoke the offer of a consulting arrangement, and that such action constitutes unlawful retaliation in violation of the ADEA and PHRA. *See* 29 U.S.C. § 623(d); 43 Pa.Stat. Ann. § 955(d). The same general standards and analysis apply to retaliation claims under both statutes. *See Fogleman v. Mercy Hosp., Inc.,* 283 F.3d 561, 567 (3d Cir.2002).

■ To establish a prima facie case of retaliation, a plaintiff must show that: (1) he or she engaged in a protected employee activity; (2) the employer took an adverse employment action after or contemporaneous with the protected activity; and (3) a causal link exists between the protected activity and the adverse action. *Weston v. Commonwealth of Pennsylvania,* 251 F.3d 420, 430 (3d Cir.2001). The parties do not

---

ination laws. *See id.* at 1108 ("the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent") (quoting *Fuentes,* 32 F.3d at 765).

**9.** In fact, Plaintiff's memorandum of law is devoid of citation to any case that is factually analogous to the case at bar with respect to any issue presented here.

dispute that the first element is satisfied because Plaintiff engaged in a protected activity when he complained about age discrimination. The dispute arises somewhere amidst the second and third elements, and is not easily categorized. While Plaintiff contends that PRI revoked an open offer of a consulting arrangement in retaliation against his discrimination complaints, PRI contends that it did no such thing, and that in fact Plaintiff rejected the agreement. As PRI puts it, "there was nothing for PRI to take an adverse action against." Rather, it argues, PRI merely declined to renew the offer after it had been rejected by Plaintiff.

■ The chronology of events and the documentary evidence before the Court demonstrates that Plaintiff has failed to meet his burden of demonstrating a prima facie case of retaliation. Plaintiff initially accepted the Separation Agreement on April 10. On April 14 he called Ms. Hochberg–Smith and Mr. Kuhn, and during these conversations he complained that his firing was the result of discrimination, revoked his acceptance of the Separation Agreement, and requested additional time to consider it while he continued discussions with Ms. Hochberg–Smith about his discrimination charge. PRI granted this extension in order to "allow Marion Hochberg–Smith to review the issues." Facsimile of 4/17/00 from Vanderhorst to Thakur. That same day, at Plaintiff's request, PRI provided additional information about the consulting arrangement described in the Separation Agreement, setting forth the expected time commitment, the project assignments, and the PRI employees with whom Plaintiff would be working.

On June 28, PRI reissued the Separation Agreement, asking Plaintiff to respond within fourteen days. On July 11, Plaintiff faxed a handwritten note to PRI ("I have mailed to you attached copy re-

jecting the agreement & release"), and attaching a form letter where Plaintiff checked a box next to the words, "I am rejecting this Agreement and Release." Plaintiff's signature appears directly beneath this language.

On July 18, Plaintiff's attorney wrote to PRI confirming that Plaintiff had rejected the Separation Agreement ("As you have been apprised by Mr. Thakur the Agreement and Release has been rejected."), but requesting information about the "independent consulting position" offered in the Separation Agreement. On August 2, PRI responded, writing, "With respect to a consulting position, in light of your client's unwarranted reservations that is probably not an optimal solution." Plaintiff contends that it is in this August 2 letter that PRI revoked the offer of a consulting arrangement, and thus retaliated against him in violation of the ADEA and PHRA.

Plaintiff's argument is based on the erroneous premise that although he rejected the Separation Agreement, PRI's offer of a consulting position somehow remained pending. There is no support in the record for this premise.

The Separation Agreement is a seven page, single-spaced document in letter form, and begins with the following statement:

This will confirm your separation from [PRI] effective as of April 14, 2000. . . . The following Agreement and Release describes your existing rights and obligations relating to your departure from [PRI] *and offers you certain additional benefits.*

Separation Agreement at 1 (emphasis added). Nineteen numbered paragraphs follow. The "certain additional benefits" appear in paragraph three, which offers "Separation Payments" above and beyond that to which Plaintiff was already entitled,

and paragraph six, which offers the consulting arrangement. It provides:

> In addition to the compensation stated in paragraph three (3) of this Agreement and Release, we are prepared to offer you a consulting agreement for a fixed amount of days per month at your current rate of pay, $38.85 per hour, to conduct work on Topiramate®. If you elect to conduct such work, a consulting contract will be prepared.

*Id.* at 2, ¶ 6. Plaintiff argues that there is nothing in this language or anywhere else in the Separation Agreement to suggest that a rejection of the Separation Agreement would constitute a rejection of the consulting offer.

On the other hand, the Court notes that there is nothing to suggest that the offer of a consulting arrangement, which was buried among nineteen other paragraphs related to Plaintiff's separation, was somehow independent of the benefits offered in the Separation Agreement. As such, it is obvious to the Court, as it would be to any reasonable juror, that when Plaintiff rejected the Separation Agreement, he rejected it in its entirety. It strains credulity and common sense to suggest that out of nineteen paragraphs in this lengthy document, Plaintiff wished to reject all of it save one paragraph, and yet failed to so indicate when he did so. More importantly, there is nothing in the record to support the notion that PRI believed that he had rejected the Separation Agreement in part only, and that it was aware that Plaintiff intended to pursue the consulting arrangement. No reasonable jury could reach this conclusion.

In addition, Plaintiff's suggestion that PRI revoked the offer of a consulting arrangement only after learning that Plaintiff intended to pursue a discrimination claim does not square with the chronology of events. Plaintiff first raised the specter of discrimination on April 14, when he revoked his acceptance of the Separation Agreement. Yet, over the next three months PRI granted his request for an extension of time, reissued the Separation Agreement, and awaited his response, all while it was fully aware of Plaintiff's charges of discrimination. Plaintiff unambiguously rejected the offer, and he cannot now allege discrimination because PRI refused to issue the offer a third time.

Accordingly, Plaintiff cannot meet his burden to show a prima facie case of retaliation, and thus summary judgment in favor of PRI on Plaintiff's retaliation claims is warranted. An appropriate Order follows.

### *ORDER*

**AND NOW**, this 25th day of June, 2003, upon consideration of Defendant The R.W. Johnson Pharmaceutical Research Institute's Motion for Summary Judgment [Doc. # 17], Plaintiff's Answer thereto [Doc. # 18], Defendant's Reply Brief [Doc. # 21], and for the reasons set forth in the attached Memorandum Opinion, it is hereby **ORDERED** that Defendant's Motion is **GRANTED**. Summary Judgment is hereby ENTERED in favor of Defendant and against Plaintiff, and the Complaint is **DISMISSED WITH PREJUDICE**.

It is so **ORDERED**.